Let a decision be handed up and settled on notice in conformity with this opinion.

---

(22 Misc. Rep. 729.)

MANHATTAN FIRE–ALARM CO. v. WEBER et al.

(Supreme Court, Appellate Term. February 28, 1898.)

1. APPEAL—REVIEW—CONFLICTING EVIDENCE.
    Where there is sufficient evidence to support a finding for either party, the finding of the trial judge will not be disturbed.

2. IMPLIED CONTRACTS FOR SERVICES—ACQUIESCENCE.
    The omission to disconnect wires, and so render worthless the fire-alarm service put in by plaintiff, cannot render defendant liable for the service, in the absence of a request to maintain it.

3. SAME—DISCHARGING OBLIGATION OF ANOTHER.
    A company operating a fire-alarm system which was officially sanctioned, but not to the exclusion of other systems, by the fire and police board, under Laws 1882, c. 410, § 454, as amended by Laws 1892, c. 703, § 1, compelling theaters to provide such means of communicating alarms of fire as the said

board may direct, cannot recover the value of their services rendered to the lessees of a theater, who had never ordered the same, on the ground that the company, in the public's interest, discharged an obligation imposed by law on the lessees, since the lessees must first have been given an opportunity to act, it not being shown that they had no other fire system in the building, and since the public authorities had power to compel the lessees to discharge the duty which the law imposed.

Appeal from First district court.

Action by the Manhattan Fire-Alarm Company against Joseph Weber and Lewis Fields. From a judgment in favor of defendants, plaintiff appeals. Affirmed.

Argued before BEEKMAN, P. J., and GILDERSLEEVE and GIEGERICH, JJ.

Robert L. Morrell, for appellant.

Moses H. Grossman and Michael Schaap, for respondents.

GIEGERICH, J. On the 1st day of September, 1896, the defendants became the lessees of a certain music hall or theater in the city of New York, in which plaintiff had theretofore installed, for a former lessee, five fire-alarm boxes. These remained upon the premises until the 16th day of September, 1897, when they were removed by the plaintiff, who seeks to recover for having maintained such service during the period mentioned. The defendants contest the claim, on the ground that neither of them requested the service, and merely suffered the alarm signals to remain upon the premises pending plaintiff's attempt to secure from them a contract for their maintenance in the future. Plaintiff, while conceding that the defendants did not expressly assent to, or promise to pay for, a continuation of the service, nevertheless bases its right to recover upon the theory that the facts and circumstances of the case bring it within the rule that where one voluntarily accepts and avails himself of valuable services, rendered for his benefit, when he has the option to accept or reject them, with knowledge that the party rendering the same expects payment therefor, a promise to pay may be inferred even without distinct proof that they were rendered at his request. Lawson, Cont. § 34; Benj. Cont. 18; 1 Pars. Cont. (8th Ed.) 486; Day v. Caton, 119 Mass. 513; Davidson v. Gaslight Co., 99 N. Y. 559, 566, 2 N. E. 892. The difficulty with this position, however, is that the testimony upon which it is based was contradicted.

At the trial, Richard F. Alexander, plaintiff's superintendent, testified that on September 25, 1896, he first called at defendants' place of business, and was referred by the defendant Weber to Mr. Teller, defendants' manager; that the latter, on being informed that the plaintiff wished to have a contract signed, said, "They [meaning the apparatus] belong to us, everything in the building; we took everything in the building;" but, upon being told that the plaintiff company had merely rented, and not sold, the alarm signals, he stated that, as he had to see Mr. Miner about other things in connection with the theater, he would also see him about the one in question, and would let him (witness) know; that at the same time he left with Mr. Teller a proposed contract, embodying the terms upon which

plaintiff was willing to furnish the service; that on October 23, 1896, he again called on Mr. Teller, who, in reply to inquiry, said that he had not as yet seen Mr. Miner about the matter, but did expect to do so; that on March 10, 1897, he again called, and, in the absence of both defendants and Mr. Teller, left another proposed contract; and that on August 9, 1897, and while the location of one of the boxes was being changed by request of defendants' electrician, the following conversation between the defendant Weber and the witness ensued:

"Q. What did he say? A. He asked what I was doing. I said, 'We are moving the box of this fire alarm.' Q. What did he say? A. He said, 'I don't know about it.' Q. Did he ask who had ordered it moved? A. I am not certain that he asked that question, but I told him who ordered it moved. Q. He did not object to your moving it? A. I said the electrician had ordered it. I said, 'If you don't want it moved, now is the time to say so.' Q. What did he answer to that? A. He said, 'I suppose it is all right,' or words to that effect, and then walked away."

That the apparatus was inspected at regular intervals was also testified to by him. Upon cross-examination the witness testified that neither defendant had requested the putting in or continuing of the apparatus, and that the location of the box was changed while extensive alterations were being made in the music hall.

Albert H. Cross, secretary of the plaintiff company, testified that he mailed several letters to the defendants respecting the matter; that in two of them he inclosed a bill for the service; and that no answer was ever received in acknowledgment of either.

The defendant Weber was called as a witness for the plaintiff, and said that he could not say as a matter of fact whether fire-alarm boxes were in the theater from September 1, 1896, to September 1, 1897; that he had no personal knowledge whether the law required proprietors of theaters to use the Manhattan fire-alarm service; and that upon the abandonment of the premises by the former lessee, one Krauss, he and his co-defendant took possession. Upon cross-examination he denied that he ever authorized or requested a maintenance of the service.

The defendants called their manager, Leo C. Teller, who testified that he not only never authorized or agreed to pay for the maintenance of the service, and that he never promised Mr. Alexander or any one else that he would execute, or cause to be executed, a contract therefor, but that he ordered the boxes to be taken out of the theater, and that no bill purporting to be for such service was ever received. On cross-examination he testified that, when Mr. Alexander first called to know whether the defendants "wanted or had some fire apparatus," he (witness) said they "had negotiated an arrangement with Mr. Miner," whom he would see; that the proposed contract was handed to him by Mr. Alexander, who remarked that "they had some fire-alarm apparatus there, and wanted us [defendants] to make a contract"; and that the witness then promised Mr. Alexander that he would make an investigation, after which the latter left, with the expressed intention of calling again. He further testified:

"Q. What do you mean when you said you would see Mr. Miner about these boxes? A. So many things came in after Mr. Krauss had left. and I said I would see Mr. Miner as to what they were. Mr. Miner told me they paid some of the bills for Mr. Krauss. Q. Did you see Mr. Miner about these boxes? A. Yes, sir. Q. What did he say? A. He said he had nothing to do about Krauss' bill, and, if they wanted money from Krauss, to sue Krauss."

The witness also testified that Mr. Alexander never said anything about a bill against Mr. Krauss, and sought only to have a contract signed; that witness said he would investigate, and did so; that he did not know the boxes were in the theater, and never remembered seeing them, and that no inspection was ever made; that in June, 1897, he told plaintiff's representative (who called with a proposed contract) to remove the apparatus, as the defendants did not desire to make the contract after having learned of its nature. His following redirect examination is affirmative of his direct testimony:

"Q. How many times did you instruct Mr. Alexander or a representative of the corporation to take out these things? A. Once or twice, the last time they called. Q. Did you let him believe you would enter into a contract at any time, or wanted the service to continue? A. No. Q. You are positive of that? A. Yes, sir."

In rebuttal of this testimony, the plaintiff recalled Mr. Alexander, who testified that on September 16, 1897, he told Mr. Teller he "had come with the contracts and bill, and that we must have it settled, or discontinue the service; that those were my orders"; and that the latter replied "to disconnect." Then follows:

"Q. Then you took the boxes out? A. Disconnected, so that they did not work."

It will be seen from the foregoing narration of the testimony that the main question presented for solution was one of fact. There was sufficient evidence in the case to support a finding either way. But it was the function of the trial justice to determine on which side the weight of the evidence inclined, or that the evidence did not preponderate in favor of the plaintiff; and, having found for the defendant upon a conflict of evidence, we should not disturb his conclusions. Weiss v. Strauss (Com. Pl.) 14 N. Y. Supp. 776; Lynes v. Hickey, 4 Misc. Rep. 522, 24 N. Y. Supp. 731. The plaintiff could at any time have discontinued the service by disconnecting the wires, and so rendering the apparatus worthless; but it did not see fit to do so, and merely because of such omission it cannot impose a liability on the defendants, in the absence of their request to maintain it.

Plaintiff further contends that the defendants were under a legal duty to maintain upon their premises an apparatus such as it had installed there, and we infer therefrom that the rule invoked is that where an obligation is imposed by law upon one to do an act, because of the interest which the public has in its performance, and he fails to perform it, another who performs it with the expectation of receiving compensation should be allowed to recover against the former. Keener, Quasi Cont. p. 341. The burden, however, is on the person making such a claim to establish the necessity for his intervention, as well as that the act done should have been performed by the person from whom recovery is sought. Id. p. 347.

In Keener on Quasi Contracts (page 349) the learned author says:

"To charge a defendant for services rendered in the discharge of an obligation which he (the defendant) should have performed, the plaintiff must establish a necessity for his (the plaintiff's) action. In a case where the reason for the appeal to the plaintiff is the fact that the defendant has failed in his obligation, then no notice is necessary. If, however, the defendant has not refused to discharge his obligation, and his failure to act has been due to his want of opportunity, he must, if he is in a position to act, be given the opportunity before any one will be justified in acting in his stead."

The consolidation act, among other things, provided that:

"The owners or proprietors of all * * * theaters and music halls * * * shall provide such means of communicating alarms of fire, accident, or danger to the police and fire departments, respectively, as the board of fire commissioners or the board of police commissioners may direct." Laws 1882, c. 410, § 454, as amended by Laws 1892, c. 703, § 1.

There was no direct proof that the public authorities ever adopted plaintiff's system, but it is fairly deducible from the letter of February 19, 1897, that it had been installed in some of the theaters in the city of New York by their consent. There is no pretense whatever that the plaintiff's system was the only one which had received official sanction during the period plaintiff claims to have maintained the service, and therefore the defendants were not confined in their choice to the service furnished by the plaintiff. Moreover, the record fails to disclose whether or not any other fire-alarm system was provided by the defendants during the period in question. But, aside from this, there was no necessity for the plaintiff to maintain its service upon the defendants' premises, as the public authorities had ample power to compel the defendants to discharge the duty which the law imposed (Laws 1882, c. 410, § 465, as amended by Laws 1892, c. 703, § 3); and hence, even though the evidence might have justified the inference that the plaintiff expected to be remunerated for maintaining the service, it cannot recover upon the ground that it, in the public's interest, discharged an obligation imposed by law upon the defendants (Keener, Quasi Cont. pp. 344, 347; Force v. Haines, 17 N. J. Law, 385).

For these reasons, to my mind, the judgment should be affirmed, with costs. All concur.